ELDER, Judge,
dissenting.
I would hold that a right of family privacy protecting certain communications between parents and children is implicit in Virginia law and protects the conversation at issue in this case.[4] Even in the absence of such a privacy right, I would hold that appellant’s subjective expectation of privacy in the interview room was one that society should be prepared to recognize as reasonable under the facts of this case. Therefore, I respectfully dissent.
As the majority observes, the United States Supreme Court noted in Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962), that “it may be assumed that even in a jail, or perhaps especially there, the relationships which the law has endowed with particularized confidentiality must continue to receive unceasing protection.... ” Id. at 143-44, 82 S.Ct. at 1221.
Although the Supreme Court’s discussion of prisoners’ privacy and confidential relationships in Lanza was dicta, see id. (noting that Lanza did not claim violation of any special relationship), other courts have relied upon the language in Lanza to recognize exceptions to the generally accepted principle that no Fourth Amendment reasonable expectation of *463 privacy exists in prisoners’ conversations with their visitors, see, e.g., North v. Super. Ct., 8 Cal.3d 301, 104 Cal.Rptr. 833, 502 P.2d 1305,1309-12 (1972) (en banc).
In North, for example, the Supreme Court of California held that North had a reasonable expectation of privacy in a conversation with his wife under the circumstances of that case. Id. at 1311-12. The evidence established that the conversation occurred during ordinary visiting hours in a detective’s office and that it was “a frequent and normal practice to permit such visits to take place in a detective’s office.” Id. at 1307. During the five-minute visit, police secretly monitored and recorded North’s conversation with his wife. Id.
In holding the contents of the conversation should have been suppressed, the court emphasized that the conduct of a police detective in “surrendering to petitioner and his wife [the detective’s] own private office so that they might converse and then by exiting and shutting the door, leaving them entirely alone,” “spoke as clearly as words” and had the effect of “lull[ing]” North and his wife “into believing that their conversation would be confidential.” Id. at 1311. Those circumstances, “coupled with the statutory presumption that a conversation between spouses is ... made in confidence constituted a sufficient showing by [North] to establish a reasonable expectation of privacy.”[5] Id. (citation omitted). But see Ahmad A. v. Super. Ct., 215 Cal.App.3d 528, 535-36 & n. 5, 263 Cal.Rptr. 747 (1989) (refusing to apply North to jailhouse conversation between minor and parent because California law does not recognize a parent-child privilege of confidentiality).
In People v. Hammons, 235 Cal.App.3d 1710, 5 Cal.Rptr.2d 317 (1991), a case involving codefendants, the California Court *464 of Appeal expanded the holding in North to conclude that “one [may] ... reasonably expect privacy in a police station [even] absent a privileged relationship” when that “expectation of privacy [is] based upon express representations by police officers.” Id. at 1716-17, 5 Cal.Rptr.2d 317. Under the facts of that case, defendant Darby invoked his right to remain silent, but codefendant Hammons asked to speak to Darby before talking to police. Id. at 1714, 5 Cal.Rptr.2d 317. Officer Bourke put the codefendants in an interview room together and left them alone. Id. Although Bourke could not precisely recall everything he said to the codefendants, he said, “[W]e’re leaving,” and admitted that he “led [the codefendants] to believe that this was in fact a private conversation between just the [two codefendants].” Id. The officers then “surreptitiously monitored and tape recorded” the conversation, in which the codefendants incriminated themselves. Id.
The Court of Appeal held that Bourke’s statement, although its precise content was uncertain, constituted “an express representation that [the] conversation [would] be private” and that it “create[d] a legitimate and reasonable expectation of privacy” which rendered “the surreptitious monitoring and recording of that conversation ... violative of the Fourth Amendment.” Id. at 1717, 5 Cal.Rptr.2d 317. Compare Kirkpatrick v. Joseph A. (In re Joseph A.), 30 Cal.App.3d 880, 885-86, 106 Cal.Rptr. 729 (1973) (holding that North did not apply because no privileged relationship existed between juvenile and his uncle but that even if lack of privilege did not defeat claim, officer’s actions in granting uncle’s request to see juvenile “by himself’ in an interrogation room did not amount to implied representation of privacy because request was subject to multiple meanings and trial court construed it to mean “away from other persons in custody” rather than “in private”).
Although the issue has not previously been addressed by an appellate court in this state, I would hold that Virginia’s statutory scheme compels the protection of a child’s confidential communications with his parent, guardian, legal custodian or other person standing in loco parentis. The statutes *465 governing juvenile and domestic relations district courts require that any proceedings against a juvenile originate in juvenile court, Code § 16.1-241, and that any petition filed in such a court must be served on “at least one parent, guardian, legal custodian or other person standing in loco parentis,” Code § 16.1-26S(A); see Code § 16.1-269.1 (requiring notice of transfer hearing to member of this group or to juvenile’s attorney). Similarly, the United States Supreme Court recognizes that “[d]ue process ... does not allow a hearing to be held in which a youth’s freedom and his parents’ right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet.” In re Gault, 387 U.S. 1, 33-34, 87 S.Ct. 1428, 1446-47, 18 L.Ed.2d 527 (1967). Numerous other legal principles acknowledge the importance of the role of a parent as a confidante and counselor to his minor child. See, e.g., Grogg v. Commonwealth, 6 Va.App. 598, 613, 371 S.E.2d 549, 557 (1988) (“[I]t is desirable to have a parent ... or some other interested adult or guardian present when the police interrogate a juvenile, and it is even more desirable to have an interested adult present when a juvenile waives fundamental constitutional rights and confesses to a serious crime.”); Williams v. Williams, 24 Va.App. 778, 783, 485 S.E.2d 651, 653 (1997), aff'd as modified, 256 Va. 19, 501 S.E.2d 417 (1998) (recognizing right of parents to raise their children as both a fundamental liberty interest and a component of privacy rights); cf Code § 16.1-283 (permitting termination of parental rights only under extreme circumstances and after efforts by the Commonwealth to provide services necessary to permit continued custody).
A New York court has concluded that protection for certain communications between parents and children, although not technically a statutory or common-law privilege like the generally accepted privileges for attorney-client and interspousal communications, arises from a constitutional “right of family privacy” established by “a host of [United States Supreme Court] cases.” People v. Doe (In re A and M), 61 A.D.2d 426, 403 N.Y.S.2d 375, 378 (1978), quoted with approval in People v. Harrell, 87 A.D.2d 21, 450 N.Y.S.2d 501, 504 (1982), aff'd on *466 other grounds, 59 N.Y.2d 620, 463 N.Y.S.2d 185, 449 N.E.2d 1263 (1983).
It would be difficult to think of a situation which more strikingly embodies the intimate and confidential relationship which exists among family members than that in which a troubled young person, perhaps beset with remorse and guilt, turns for counsel and guidance to his mother and father. There is nothing more natural, more consistent with our concept of the parental role, than that a child may rely on his parents for help and advice. Shall it be said to those parents, “Listen to your son at the risk of being compelled to testify about his confidences?”[6]
[T]here can be no doubt what the effect on that relationship would be if the state could compel parents to disclose information given to them in the context of that confidential setting. Surely the thought of the State forcing a mother and father to reveal their child’s alleged misdeeds, as confessed to them in private, to provide the basis for criminal charges is shocking to our sense of decency, fairness and propriety. It is inconsistent with the way of life we cherish and guard so carefully and raises the specter of a regime which encourages betrayal of one’s offspring. And if, as seems likely, the parents refuse to divulge the child’s confidences, the alternatives faced by the parents, i.e., risk of prosecution for contempt or commission of perjury, could seriously undermine public trust in our system of justice.
The course of constitutional law is filled with instances wherein the interests of the State in achieving a legitimate goal have been balanced against the rights of individual privacy guaranteed by the Constitution.... [Thus], if it is determined that the information sought here was divulged *467 by the boy in the context of the familial setting for the purpose of obtaining support, advice or guidance, we believe that the interest of society in protecting and nurturing the parent-child relationship is of such overwhelming significance that the State’s interest in fact-finding must give way.
A and M, 403 N.Y.S.2d at 378-80 (footnote added).
In light of the approach of Virginia law to the relationship between juveniles and their parents and the constitutional principles outlined so cogently in A and M, I would hold that the right of family privacy protected appellant’s communications with his mother and her partner in much the same way a formal privilege would have.[7] Under the reasoning of the California Supreme Court in North, Detective Gandy’s conduct in “surrendering” the interview room to appellant, his mother and her partner, Carl Gray, after Gray’s indication that appellant would make no statement without a lawyer, “so that they might converse and then by exiting and shutting the door, leaving them entirely alone,” “spoke as clearly as words” and had the effect of “lull[ing]” appellant “into believing that their conversation would be confidential.” North, 104 Cal.Rptr. 833, 502 P.2d at 1311. Those circumstances, “coupled with [the *468 right of family privacy akin to] the statutory presumption that a conversation between spouses is ... made in confidence constituted a sufficient showing by [appellant] to establish a reasonable expectation of privacy.” Id. (citation omitted). Thus, admission of Detective Gandy’s testimony regarding appellant’s whispered statements violated both the Fourth Amendment and Code § 19.2-65.
Even if no right of family privacy existed under the facts of this case to protect appellant’s communications with his mother and her partner, I would hold that Detective Gandy’s statements and actions, standing alone, constituted a representation sufficient to afford appellant an objectively reasonable expectation of privacy. See Hammons, 235 Cal.App.3d at 1716-17, 5 Cal.Rptr.2d 317; see also People v. A.W., 982 P.2d 842, 848-49 (Colo.1999) (en banc) (holding officer’s explicit assurances that no one was behind the two-way mirror and that he would not be listening in gave rise to objectively reasonable expectation of privacy for juvenile in interview room communications with his father). When Carl Gray told Detective Gandy in appellant’s presence that appellant would not make a statement until after they consulted a lawyer, appellant did not contradict Gray, and Gandy acquiesced to the request by leaving the room. Gandy testified that he thought “it would be best if [appellant] consulted a lawyer before anything was said.” Nevertheless, Gandy “wanted to see if they said anything,” so he went to the monitoring room in an effort to overhear any conversation appellant, appellant’s mother and Gray might have. Under these circumstances, I would hold that appellant’s subjective expectation of privacy in the interview room he occupied with only his mother and her boyfriend was one society was prepared to recognize as reasonable even if Detective Gandy was not so prepared. Thus, under this approach, as well, admission of Detective Gandy’s testimony regarding appellant’s whispered statements violated both the Fourth Amendment and Code § 19.2-65.[8]
*469 For these reasons, I would hold that the trial court erroneously denied the motion to suppress, and I would reverse and remand for additional proceedings. Therefore, I respectfully dissent.

. The majority holds in footnote 2 that appellant did not preserve for appeal the issue of whether a parent-child privilege exists. As set out infra in the dissent, I would recognize a right of privacy rather than a true privilege. Thus, I would hold that the existence of a parent-child relationship which gives rise to a right of privacy is merely a factor for consideration in determining whether appellant had a reasonable expectation of privacy. Because appellant properly preserved for appeal the reasonable expectation of privacy issue, I would hold we also may consider the impact of the parent-child relationship on that expectation. This is precisely the approach appellant advanced in oral argument before this Court. As the majority acknowledges in footnote 1, ”[a]s long as [an] issue [is] properly preserved, an appellate court shall decide the issue according to controlling legal principles.”

. Since the decision in North, California’s legislature has expanded the list of rights retained by prisoners and specifically “guarantees that prisoners shall retain all rights except to the extent that restrictions are necessary for public safety or institutional security.” DeLancie v. Sup. Ct., 31 Cal.3d 865, 183 Cal.Rptr. 866, 647 P.2d 142, 147 n. 8 (1982).

. As another commentator has questioned, "[W]hen a child comes to Mom or Dad for advice, do parents need to issue the classic warning, 'Anything you say may be used against you in a court of law’? Such an intrusion seems contrary to the political focus on family values.” Margaret Graham Tebo, Parent Privilege: Lawmakers Seek to Protect Parent Child Conversation, 86 A.B.A. J. 18 (2000).

. Formal privileges may be "waived” or "broken” if the communication occurs in the presence of a third party to whom the privilege does not apply. See, e.g., Harris v. Commonwealth, 19 Va.App. 518, 521-22, 453 S.E.2d 292, 294 — 95 (1995). As such, if a formal privilege existed here, it could be argued that the presence of Gray, who was merely appellant’s mother’s partner rather than appellant’s father or stepfather, would defeat any assertion of a privilege. However, in the context of the right to privacy and the principles which support that right, I would conclude that Gray was present as a de facto parent in whom appellant confided just as he likely, would have if Gray had been his biological father or stepfather. Gray described himself to Detective Gandy as appellant’s stepfather, and Gandy's testimony about appellant's statements indicated that appellant’s mother and Gray treated both appellant and Williams as "their ... son[s].” Cf. Code § 16.1-241 (granting juvenile and domestic relations district court jurisdiction over "[a]ll offenses in which one family or household member is charged with an offense in which another family or household member is the victim”); Code § 16.1-228 (defining "[fjamily or household member” to include, inter alia, “any individual who cohabits ... with the person, and any children of either of them then residing in the same home with the person”).

. In the absence of a family privilege, appellant's mother and Gray could be called to testify and could be held in contempt for refusing to *469 appear. However, if both took the stand and testified that appellant spoke to them about the weather rather than the offense for which appellant had been arrested, the Fourth Amendment and Code § 19.2-65 would bar admission of the exchange recorded and overheard by Detective Gandy.